1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| ANNIE HARMON, individually and as joint successor-in-interest to Decedent LAMONT HARMON; MARGARET HOOPER, individually and as joint successor-in-interest to Decedent LAMONT HARMON; H.H., a minor, individually and as a joint successor-in-interest to Decedent LAMONT HARMON, through her Guardian Ad Litem, MARGARET HOOPER; THE ESTATE OF LAMONT HARMON,<br><br>           Plaintiffs,<br><br>    v.<br><br>COUNTY OF SACRAMENTO; SCOTT JONES, in his official capacity as SHERIFF for the SACRAMENTO COUNTY SHERIFF'S DEPARTMENT; NATHAN BURNETTE, individually; RICARDO MARTIN, individually; and DOES 1-50, inclusive, individually, jointly and severally,<br><br>           Defendants. | No.  2:12-cv-02758 TLN<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

        This matter is before the Court pursuant to Defendants County of Sacramento, Sheriff

Scott Jones, Nathan Burnette, and Ricardo Martin's (collectively referred to as "Defendants")

Motion for Summary Judgment and/or Summary Adjudication.  (ECF No. 25.)  Plaintiffs Annie

Harmon, Margaret Hooper and H.H., a minor, by and through her guardian ad litem Margaret

Hooper ("Plaintiffs") oppose Defendants' motion.  (ECF No. 32.)  Defendants have filed a reply.

(ECF No. 36.)  The Court has carefully considered the briefing filed by both parties.  For the reasons set forth below, Defendants' Motion for Summary Judgment and/or Summary Adjudication (ECF No. 25) is hereby GRANTED IN PART and DENIED IN PART.

## I.   FACTUAL BACKGROUND[1]

In the early morning hours on February 6, 2012, Defendants Burnette and Martin (hereinafter "Burnette" and "Martin") were partnered together and were patrolling the Fruitridge/Stockton area.  (Burnette Decl., ECF No. 25-4, [hereinafter "Burnette Decl.] at ¶ 12, Martin Decl., ECF No. 25-4, [hereinafter "Martin Decl.]  at ¶ 12.)  Burnette and Martin's shift was from 6:00 p.m. to 4:00 a.m.  (Burnette Decl. at ¶ 11.)  During their patrol, Defendants learned, via the Computer Assisted Dispatch ("CAD") that the Sacramento Police Department (hereinafter "SPD") was investigating a stolen vehicle located at a 24 hour AM/PM gas station. (Burnette Decl. at ¶ 14, Martin Decl. at ¶ 14.)  At 2:45 a.m., the CAD listed information that the suspect driver of the stolen vehicle just walked inside the AM/PM store on foot.  (Burnette Decl. at ¶ 14, Martin Decl. at ¶ 14.)  At 2:46 a.m., the CAD listed that the California Highway Patrol ("CHP") had a possible Code 5 on the stolen vehicle.  (Burnette Decl. at ¶ 14, Martin Decl. at ¶ 14.)  Code 5 is shorthand for surveillance.  (Burnette Decl. at ¶ 14, Martin Decl. at ¶ 14.) Burnette stated that dispatch put out an information transmission based on information provided by Sacramento Sheriff's Deputy Treat who was using his personal scanner to monitor SPD's radio channel.  (Burnette Dep., ECF No. 31-1, at 87:17–22 [hereinafter "Burnette Dep."].)

Burnette received information that SPD had recovered the stolen vehicle, that it was parked at the AM/PM, and that a suspect was seen going into the AM/PM but had not come out of the store.  (Burnette Dep., ECF No. 31-1, at 87:4–13.)[2]  Burnette assumed that SPD was in a position of concealment at the gas station, waiting for the suspect to leave the AM/PM store. (Burnette Dep., ECF No. 31-1, at 103:2–5.)  Burnette and Martin did not receive any suspect

---

[1]      The Court uses Defendants Burnette and Martin's declarations and depositions to comprise most of the factual background because they are the only two surviving witnesses to the incident precipitating this litigation.  As stated throughout this order, Plaintiffs were not present during any of the events that transpired and cannot provide the Court with any evidence that contradicts Defendants Burnette and Martin's account of the events.

[2]      The Court notes that many of the alleged facts contained in both Burnette and Martins declarations conflict with their deposition testimony.  The Court relies primarily upon the deposition testimony of said Defendants.

1    description nor did they receive a request from SPD to assist with the investigation of the stolen

2    vehicle. (Burnette Dep., ECF No. 31-1, at 87:14–16; 91:7–8.)  Martin stated that Sacramento

3    Sheriff Deputy Arbuckle alerted them that SPD was watching a stolen vehicle at the location.

4    (Martin Dep., ECF No. 31-2, at 46:2–11 [hereinafter "Martin Dep."].)  Martin stated the

5    communications they received was SPD was in the process of recovering a stolen car, they had

6    three patrol units at the AM/PM where the stolen car was located, and they had the situation

7    handled.  (Martin Dep., ECF No. 31-2, at 54:6–22.)

8        When they drove by the AM/PM, Burnette saw SPD officers on foot in the gas station and

9    two to three patrol cars with headlights on.  (Burnette Dep., ECF No. 31-1, at 91:2–6; 103:10–

10   14.)  Burnette felt that SPD wasn't really doing surveillance.  (Burnette Dep., ECF No. 31-1, p.

11   103:13-15.)  Burnette did not have any information that anyone had fled the scene or had been

12   taken into custody.  (Burnette Dep., ECF No. 31-1, at 103:16–25.)  Based on this information,

13   Burnette believed the suspect was outstanding, so he decided to go search the area for individuals

14   that could be related to the stolen vehicle.[3]  (Burnette Dep., ECF No. 31-1, at 103:23–25; 116:1–

15   23.)  Defendants had not received a request from dispatch or SPD to search for outstanding

16   suspects.  (Burnette Dep., ECF No. 31-1, at 116:18–23.)  Burnette never told Martin that they

17   were going to look for a suspect.  (Burnette Dep., ECF No. 31-1, at 116:9–17.)  When they left

18   the location of the AM/PM Martin intended to continue on with their normal patrol duties but he

19   didn't communicate his intent to Burnette.  (Martin Dep., ECF No. 31-2, at 57:1–12.)  Burnette

20   was the driver and Martin was the passenger.  (Martin Dep., ECF No. 31-2, at 32:23–25; 33:1–2.)

21       Defendants proceeded north on Stockton Blvd.  (Burnette Decl. at ¶ 18, Martin Decl. at ¶¶

22   16, 18.)  As they approached the Kmart parking lot adjacent to and on the other side of the

23   shopping center containing the AM/PM, Burnette noticed a figure, who turned out to be Decedent

24   Lamont Harmon ("Harmon"), walking through the parking lot, five yards from the only other car

25   in the parking lot.  (Martin Dep., ECF No. 31-2, at 64:5–18; 69:3–6.)  Burnette described the area

26   as a high crime area with a lot of violent crime, a lot of robberies, and a lot of gun crimes.

---

27   [3]    During his deposition testimony Burnette learned for the first time that prior to his search for suspects, SPD
28   had actually taken two people into custody who were associated with the stolen vehicle. (Burnette Dep., ECF No. 31-1, at 105:1–19.)

(Burnette Dep., ECF 31-1, at 146:12–16; 159:24–25.)  Martin did not realize they were going into the parking lot until Burnette said, ". . . let's talk to this guy."  (Martin Dep., ECF No. 31-2, at 64:5–15.)  Burnette did not advise other officers over the radio that he would be making contact with Harmon.  (Burnette Dep., ECF No. 31-1, at 118:2–23.)

Harmon was the only person in the area on foot.  (Burnette Decl. at ¶ 19.)  When Burnette saw Harmon walking in the dark parking lot he wasn't sure if he was affiliated with the stolen car or just leaving work.  (Burnette Dep., ECF 31-1, at 129:7–13.)  Burnette was aware that the AM/PM was open 24 hours and that there was housing in the vicinity of where Harmon was stopped.  (Burnette Dep., ECF 31-1, at 135:14–19.)  Burnette knew it was not uncommon to see people in this area coming and going.  (Burnette Dep., ECF 31-1, at 135:20–22.).  Burnette indicated it was a cold night and Harmon had on a jacket.  (Burnette Dep., ECF 31-1, at 135:23–25.)

Burnette did not recall turning off his headlights which is something officers are taught to use to gain a tactical advantage so they can get closer to a subject without being detected.  (Burnette Dep., ECF 31-1, at 130:14–25; 131:1–11.)  Martin stated that Burnette had turned off his headlights prior to contacting Harmon.  (Martin Dep., ECF No. 31-2, at 69:10–21.)  Martin was surprised at both the entire contact, and the fact that the headlights were out.  (Martin Dep., ECF No. 31-2, at 69:22–25.)

Defendants drove into the Kmart parking lot, activated their alley light, front headlights and take-down lights (take down lights are white lights similar to head lights) as they were driving up to Harmon.  (Burnette Dep., ECF No. 31-1, at 132:5–12.)  Burnette drove his vehicle approximately five to seven yards from Harmon before stopping.  (Burnette Dep., ECF No. 31-1, at 131:16–22.)  Harmon stopped walking as they pulled up to him. (Burnette Dep., ECF No. 31-1, at 131:23–25; 132:1.)

As they were driving up, they turned on the lights to illuminate Harmon who they could see was a black male, wearing a heavy jacket.  (Burnette Dep., ECF No. 31-1, at 132:13–22.)  Defendants exited the patrol vehicle and identified themselves as law enforcement.  (Burnette Dep., ECF No. 31-1, at 142:16–23.)  Defendants were both dressed in full Sacramento County

Sheriff's Department uniforms.  (Burnette Decl. at ¶ 24; Martin Decl. at ¶ 22.)  Burnette said he

exited the vehicle very quickly.  (Burnette Dep., ECF 31-1, at 139: 8–12.)  Martin approached the

person as the "contact" officer, taking the lead in conversing with Harmon, while Burnette acted

as the "cover" officer, standing in front of the patrol vehicle in order to watch the movements of

the subject, so the contact officer could concentrate on the conversation.  (Burnette Dep., ECF

No. 31-1, at 140:1–25; 141:1–12.)

Martin stated that as he got out of the vehicle, Harmon was coming in his direction.

(Martin Dep., ECF No. 31-2, at 71:16–22.)  Both Defendants were near Harmon, kind of in a

triangular position or at different angles relative to Harmon.  (Burnette Dep., ECF No. 31-1, at

141:11–17.)  Burnette had his flashlight out but doesn't recall whether he was shining it at

Harmon.  (Burnette Dep., ECF No. 31-1, at 142:5–9.)  Martin recalled that he did use his

flashlight to illuminate Harmon.  (Martin Dep., ECF No. 31-2, at 82:4–10.)

Martin began questioning Harmon, first asking him what he was doing in the area.

(Martin Dep., ECF No. 35-2, at 76:22–24.)  From the point in time in which they initially saw

Harmon walking in the parking lot up until they identified themselves as officers, Harmon did not

try to flee nor did he discard anything.  (Burnette Dep., ECF No. 31-1, at 142:24–25; 143:1–15.)

Harmon responded with either "huh" or "what," and had a "thousand yard stare" like he was

looking right past Martin.[4]   (Martin Dep., ECF No. 35-2, at 76:22–25; 77:2; 82:23–25.)  Harmon

eventually said he lived in the area.  (Burnette Dep., ECF No. 31-1, at 144:4–21.)  Martin next

asked Harmon whether he was on probation or parole.  (Martin Dep., ECF No. 35-2, at 82:20–

25.)  Harmon denied being on parole and continued to stare blankly at Martin.  (Martin Dep., ECF

No. 35-2, at 82:20–25.)

While Martin was within a couple of feet of Harmon, he was looking for signs to see if

Harmon had a weapon, if he was going to run, and his demeanor.  (Martin Dep., ECF No. 35-2, at

77:9–19.)  Neither Martin nor Burnette observed any weapons on Harmon, saw any bulges in his

pocket, or saw anything in Harmon's waistband which was covered by his black leather jacket.

---

[4]        Defendants describe Harmon as exhibiting a "thousand yard stare," which Defendants assert is often
indicative of a person lying or thinking about his options, i.e. whether to fight or run.  (*See* Burnette Decl. at ¶ 25;
Martin Decl. at ¶ 23.)

1  (Martin Dep., ECF No. 35-2, at 77:20–25; 78:1–8; Burnette Dep., ECF No. 31-1, at 143:16–21;

2  Burnett Dep., ECF No. 35-1, at 156:2–25.)  Harmon did not make any movements toward his

3  waistband.  (Martin Dep., ECF No. 35-2, at 78:9–12.)

4  Martin stated that during the questioning he noticed Harmon's right hand was in a fist

5  down to his side and Harmon's left hand was free.  (Martin Dep., ECF No. 35-2, at 83:5–7.)

6  Martin stated he wasn't getting a good feeling about the situation based on Harmon's initial

7  response or lack of response to his initial questioning, the lack of lighting in the parking lot, and

8  Harmon's puffy jacket.  (Martin Dep., ECF No. 35-2, at 83:1–4.)  Martin decided he was going to

9  do a cursory search of Harmon for weapons.  (Martin Dep., ECF No. 35-2, at 83:7–8.)  Martin

10  then asked Harmon whether he had any weapons on him.  (Martin Dep., ECF No. 35-2, at 83:9–

11  10.)  Harmon hesitated before responding that he did not have a weapon.  (Burnett Dep., ECF 35-

12  1, at 148:8–11.)

13  As Martin grabbed Harmon's arm or jacket, Harmon pulled away and started to run from

14  the officers.  (Burnette Dep., ECF No. 35-1, at 168:5–22; Martin Dep., ECF No. 35-2, at 83:10–

15  12)  Burnette commanded for him to stop.  (Burnette Decl. at ¶ 30; Martin Decl. at ¶ 28.)

16  Harmon did not heed Burnette's command.  (Burnette Decl. at ¶ 33; Martin Decl. at ¶ 29.)

17  Burnette immediately began to pursue Harmon on foot.  (Burnette Decl. at ¶ 32; Martin Decl. at ¶

18  29–30.)  Martin returned to the patrol vehicle.  (Burnette Decl. at ¶ 32; Martin Decl. at ¶ 30.)

19  Martin then radioed that Burnette was in foot pursuit.  (Martin Decl. at ¶ 29.)  As Harmon ran

20  from Burnette, he threw items from his person.  (Burnette Decl. at ¶ 33; Martin Decl. at ¶ 29.)

21  During the chase, Burnette stated that Harmon was reaching into his pockets and that he

22  saw him throw something small like a small baggy or bindle which Burnette thought was a baggy

23  of drugs.[5] (Burnette Dep., at 173:25; 174:1–20.)  Burnette said during the pursuit Harmon was

24  trying to unzip his jacket which was partially zipped down at the conclusion of the pursuit.

25  (Burnette Dep., at 173:25; 174:1–20.)  Burnette discharged his Taser at Harmon because: (1)

26  Harmon was fleeing arrest for obstructing, delaying and resisting officers; (2) Burnette believed

27

28  [5]  Burnette stated  there were no narcotics recovered from the path of the foot pursuit.  (Burnette Dep., at 174:22–25; p. 175:1–4.)

6

Harmon was armed with a firearm; and (3) Burnette believed Harmon was the prime suspect in the stolen vehicle.  (Burnette Dep., ECF No. 35-1, at 171:17–25; 172:3–21.)  Prior to using the Taser, Burnette was yelling commands to Harmon to stop or down.  (Burnette Dep., ECF No. 35-1, at 173:14–18.)  The barbs from the Taser struck Harmon's heavy jacket.  (Burnette Decl. at ¶ 33.)  Burnette stated that he did not see or witness the Taser having any effect on Harmon, who continued to run.  (Burnette Decl. at ¶ 33.)  Burnette then attempted to grab Harmon and push him to the ground but again failed to stop him.  (Burnette Decl. at ¶ 36.)  On the second attempt, Burnette managed to grab Harmon's jacket with both of his hands while they faced each other with Harmon backpedaling.  (Burnette Dep., ECF 35-1, at 179:13–25.)  Burnette stated that Harmon opened his jacket with his left hand and reached down towards his waistband area.  (Burnette Dep., ECF No. 35-1, at 180:15–18.)  Burnette alleges that he immediately released Harmon and unholstered his gun because he believed that Harmon had a gun.  (Burnette Decl. at ¶ 37.)  Burnette thought Harmon had a gun in his hands as he heard gunshots; Burnette saw muzzle flash and thought he was hit.  (Burnette Dep., ECF No. 35-1, at 180:15–18.)  Burnette then realized that he was the only one with a gun shooting.  (Burnette Dep., ECF No. 35-1, aqt 185:1–3.)  Burnette stopped firing after he saw Harmon fall to the ground.  (Burnette Dep., ECF No. 35-1, at 185:4–25.)   Four of five rounds struck Harmon, who later died from his wounds.  (Burnette Decl. at ¶ 44.)  Emergency medical help was summoned and arrived on the scene.  (Burnette Decl. at ¶ 43.)

Since the shooting occurred within the city limits, the shooting was investigated by homicide detectives from SPD.  (Burnette Decl., ECF No. 25-4 at ¶ 44; Captain Morgan Decl., ECF No. 25-4 at ¶ 14.)  SPD found that the use of force was justified under the circumstances and no charges were filed.  (Captain Morgan Decl., ECF No. 25-4 at ¶ 14.)  The Professional Standards Bureau Internal Affairs unit also reviewed the SPD investigation and found no violation of Department policy.  (Captain Morgan Decl., ECF No. 25-4 at ¶ 14.)  The autopsy showed Harmon's blood tested positive for Methamphetamine and Delta-9 THC.  (Andrews Decl., ECF No. 25-4 at ¶ 9.)

///

1

## II.    LEGAL STANDARD

2      Summary judgment is appropriate when the moving party demonstrates no genuine issue

3   as to any material fact exists, and therefore, the moving party is entitled to judgment as a matter

4   of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under

5   summary judgment practice, the moving party always bears the initial responsibility of informing

6   the district court of the basis of its motion, and identifying those portions of "the pleadings,

7   depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

8   which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

9   *Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

10   at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

11   solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

12   324 (internal quotations omitted).  Indeed, summary judgment should be entered against a party

13   who does not make a showing sufficient to establish the existence of an element essential to that

14   party's case, and on which that party will bear the burden of proof at trial.

15      If the moving party meets its initial responsibility, the burden then shifts to the opposing

16   party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec.*

17   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities*

18   *Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual

19   dispute, the opposing party may not rely upon the denials of its pleadings, but is required to

20   tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

21   support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must

22   demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

23   suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that

24   the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

25   the nonmoving party.  *Id.* at 251–52.

26      In the endeavor to establish the existence of a factual dispute, the opposing party need not

27   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

28   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

8

1  trial." *First Nat'l Bank*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is to

2  'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

3  trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963

4  amendments).

5         In resolving the summary judgment motion, the court examines the pleadings, depositions,

6  answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed.

7  R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence

8  of the opposing party is to be believed, and all reasonable inferences that may be drawn from the

9  facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S.

10  at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

11  obligation to produce a factual predicate from which the inference may be drawn.  *Richards v.*

12  *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir.

13  1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party

14  "must do more than simply show that there is some metaphysical doubt as to the material facts."

15  *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of

16  fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

17         **III.   ANALYSIS**

18         Defendants move for summary judgment on Plaintiffs': (1) First, Second and Third claims

19  for Fourth Amendment violations for unlawful detention or arrest; (2) Seventh, Tenth and

20  Fourteenth Claims as to Defendant Martin for Loss of Familial Relations, Wrongful Death and

21  Assault and Battery; (3) Ninth Claim for violation of decedent's civil rights; (4) Fifth Claim for

22  Relief for conspiracy; (5) Sixth Claim for Relief for wrongful death under 42 U.S.C. §1983; (6)

23  Eleventh Claim for Relief under California Civil Code §52.1; (7) Twelfth Claim for Relief under

24  California Civil Code §51.7; (8) Thirteenth Claim for Relief of intentional infliction of emotional

25  distress; and (9) Eighth Claim for Relief under a *Monell* theory.  (ECF No. 25.)  Defendants also

26  assert that Plaintiffs' First, Second, Third, Fourth, Eighth, and Ninth Claims for Relief should be

27  dismissed because Plaintiffs have failed to file affidavits stating each has standing as successor in

28  interest.  (ECF No. 25.) The Court shall address each one in turn.  However, first the Court finds

1    it prudent to address Defendants' allegation as to Plaintiffs' standing to bring certain survival

2    actions.  (*See* ECF No. 25-1 at 10–11.)

3         A.    Standing

4         California's statutory requirements for standing to bring a survival action are stated under

5    California Code of Civil Procedure § 377.30: "A cause of action that survives the death of the

6    person entitled to commence an action or proceeding passes to the decedent's successor in

7    interest . . ., and an action may be commenced by the decedent's personal representative or, if

8    none, by the decedent's successor in interest."  *See also Tatum v. City & Cnty. of San Francisco*,

9    441 F.3d 1090, 1093 n.2 (9th Cir. 2006) ("Where there is no personal representative for the estate,

10   the decedent's 'successor in interest' may prosecute the survival action if the person purporting to

11   act as successor in interest satisfies the requirements of California law....") (citing Cal. Civ. Proc.

12   Code §§ 377.30, 377.32).  Plaintiffs have alleged that they are bringing many of their claims as

13   successors in interest, but there is a question as to whether the requisite affidavits to commence a

14   survival action as a decedent's successor in interest have been filed.  *See* Cal. Civ. Proc. Code §

15   377.32; *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1229 (9th Cir. 2013).  At this late juncture in

16   this litigation, the Court is not going to delay deciding matters concerning the legal merits of

17   Plaintiffs' claims on this technicality.[6]  However, if such affidavits have not been filed, Plaintiffs

18   are hereby ordered to do so within thirty (30) days of the entry of this order.  Should Plaintiffs fail

19   to make the required filings, or should the information within such filings show that Plaintiffs are

20   not in fact successors in interest, the Court will dismiss the survival causes of action in this case.

21   The Court next turns to Defendants' substantive legal arguments.

22         B.    Fourth Amendment Claims: Plaintiffs' First, Second, and Third Causes of Action

23         Plaintiffs' First Cause of Action alleges that Defendants Burnette and Martin's conduct

24   violated Harmon's rights as provided for under the Fourth Amendment to the United States

25   Constitution to be free from unreasonable seizures.  (*See* FAC, ECF No. 14 at ¶ 30.)  The Second

---

26   [6]      Within Plaintiffs' briefing, they assert that they have standing because: Plaintiff Margaret Hooper is
     Decedent's surviving spouse and has an interest in Decedent Harmon's estate; Plaintiff H.H., by and through her
27   Guardian Ad Litem Margaret Hooper is the daughter of Decedent Harmon and has an interest in Decedent's Estate;
     and Plaintiff Annie Harmon is Decedent's mother and personal representative of the Estate of Lamont Harmon.
28   (Opp'n, ECF No. 32 at 13.)

1   Cause of Action asserts that Burnette and Martin detained Harmon without reasonable suspicion,

2   thus violating his right under the Fourth Amendment to be free from unlawful seizure (detention).

3   (ECF No. 14 at ¶ 32.)  The Third Cause of Action alleges that Burnette and Martin arrested

4   Harmon without probable cause and thus violated his rights as provided for under the Fourth

5   Amendment to be free from unlawful seizure (arrest). [7]  (ECF No. 14 at ¶ 34.)

6        Because the First and Second Causes of Action involve the allegations concerning

7   unreasonable or unlawful seizures, the Court addresses them together.  Then, the Court will

8   address the Third Cause of Action, involving whether an unlawful arrest occurred.

9                 *i.*       *Unreasonable and Unlawful Seizure under the Fourth Amendment*

10       The parties have both submitted arguments concerning whether the initial interactions

11  between Harmon and Defendant officers were consensual.  The Court addresses this issue first.

12  The United States Supreme Court has long held that consensual encounters do not implicate the

13  Fourth Amendment.  *See United States v.Mendenhall*, 446 U.S. 544, 552 (1980) (noting that "not

14  all personal intercourse between policemen and citizens involves 'seizures' of persons); *see also*,

15  *e.g.*, *United States v. Drayton*, 536 U.S. 194, 200 (2002) (a police officer may approach a citizen,

16  ask him for identification, ask him questions, and request consent to search him without

17  implicating the Fourth Amendment).  The test for determining whether an encounter between the

18  police and a citizen is consensual is whether the citizen recognizes he or she is free to leave.  In

19  making this determination, courts look to the totality of the circumstances surrounding the

20  encounter and ask whether a reasonable person in the same circumstances would feel that "he was

21  not at liberty to ignore the police and go about his business." *See Florida v. Bostik*, 501 U.S. 429,

22  434 (1991) (internal quotations omitted).

23       Plaintiff contends that the stop was not consensual.  (ECF No. 32 at 8–9.)  Defendants do

24  not specifically argue that the stop was consensual, but instead contend that "regardless of

---

[7]       Defendants discuss Plaintiffs' Fourth Amendment claims together and do not separate out their arguments as to each cause of action.  At first blush, the Court interpreted Defendants' arguments as pertaining to Counts I though IV, because each of these claims pertain to Decedent's Fourth Amendment rights.  However, after reviewing the briefing, it is clear that Defendants' arguments are limited to the first three causes of action that focus on the legality of Harmon's alleged detention and arrest.  The briefing is lacking of any specific arguments as to Plaintiffs' Fourth Cause of Action for excessive force.  As such, the Court has limited its discussion within this section of the Order to Counts I though III.

1   whether the initial contact between Deputies Burnette and Martin and Harmon was consensual

2   and later developed into a detention or whether the contact is deemed a detention on initial

3   contact, there was reasonable suspicion to stop Decedent."  (ECF No. 25-1 at 3.)

4        Looking at the totality of the circumstances, the Court finds that the initial February 2012

5   encounter between Burnette, Martin, and Harmon was not consensual.  The following facts

6   clearly show the nonconsensual nature of the initial encounter: Burnette believed he was actively

7   looking for suspects involved with the stolen vehicle; Harmon was singled out as he walked

8   through a darkened parking lot in the vicinity of the stolen vehicle; Burnette drove his darkened

9   vehicle within yards of Harmon before illuminating him with lights from the vehicle; both

10  Burnette and Martin quickly exited the vehicle in full police uniform and formed a triangle within

11  yards of Harmon; Martin shined his flashlight, further illuminating Harmon; Harmon physically

12  responded to the officers show of authority when he stopped walking as they pulled up to him and

13  quickly exited their vehicle; and Martin physically grabbed Harmon's arm in order to search him

14  for weapons.  These factors compel the conclusion that a reasonable person in Harmon's position,

15  faced with the same display of force would not feel that he or she "was [ ] at liberty to ignore the

16  police and go about his business."  *Bostik*, 501 U.S. at 434.

17       The Court finds that this initial encounter was a detention.  *See Terry v. Ohio*, 392 U.S. 1,

18  19 (1968) (holding that an officer has seized someone where he took a hold of him and patted

19  down the outer surfaces of his clothing).  However, a detention alone does not suffice to trigger

20  Fourth Amendment protection.  The Fourth Amendment is only violated if the contact is deemed

21  an unlawful seizure.  Where a brief seizure and/or search is prompted by a reasonable suspicion

22  of criminal activity, the Fourth Amendment is not violated.  *Id.* at 27; *Gallegos v. City of Los*

23  *Angeles*, 308 F.3d 987, 990 (9th Cir. 2002).  The purpose of the Fourth Amendment is not to

24  eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive

25  interference by enforcement officials with the privacy and personal security of individuals."

26  *United States v. Martinez-Fuerte*, 428 U.S. 543, 554.  Thus, the Fourth Amendment is not

27  violated so long as interrogating officers "have a reasonable, articulable suspicion that justifies

28  their actions."  *Gallegos*, 308 F.3d at 990.

The reasonable suspicion standard "is a less demanding standard than probable cause," and only requires "a minimal level of objective justification." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 (2000); *see also Gallegos*, 308 F.3d at 990 (holding the same); *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[T]he ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice"); *Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information"); *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time").

A court must consider the totality of the circumstances when determining whether reasonable suspicion exists. *See U.S. v. Drake*, 543 F.3d 1080, 1088 (9th Cir. 2008); *United States v. Osborn*, 203 F.3d 1176, 1181 (9th Cir. 2000). Factors to be considered in the totality of circumstances include: the surrounding neighborhood (*see United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (presence in a high crime area is relevant to a reasonable suspicion analysis)); the time of day or night (*see Drake*, 543 F.3d at 1088 (the suspect in an area very late at night is relevant)); presence in the dark parking lot of a closed business (*Skerston v. County of Los Angeles*, No. SA CV 11-00803 DDP (RZ), 2012 U.S. Dist. LEXIS 105902, at *6 (C.D. Cal. April 23, 2012)); recentness of the crime to be investigated and proximity of the suspect to the crime scene (*Drake*, 543 F.3d at 1088 (finding no error in lower court's weighing of facts in its reasonable suspicion analysis that suspects were in lone car driving very late at night along road leading from a store which had been recently robbed)); *but see Brown v. Texas*, 443 U.S. 47, 52 (1979) (holding that officers did not have reasonable suspicion for an investigatory stop when they detained two men who were walking away from each other in an alley in an area known for drug trafficking because "the … activity was no different from the activity of other pedestrians in that neighborhood"); *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1139 (9th Cir. 2000) (noting that

1    the likelihood of an innocent explanation for the defendants' presence and actions is far less than

2    if the stop took place in a residential or business area".)

3         In the instant case, the Court is not convinced that Burnette and Martin had articulable

4    facts that would support a reasonable suspicion that Harmon had committed a criminal offense.

5    In the first instance, it is questionable as to whether the officers had insufficient evidence to

6    conclude that SPD was actively investigating a reported stolen vehicle and did not have a suspect

7    in custody.  In fact, the evidence on which they relied was entirely to the contrary.  Burnette

8    received information that SPD had recovered the stolen vehicle, that it was parked at the AM/PM,

9    and that a suspect was seen going into the AM/PM but had not come out of the store.  (Burnette

10   Dep., ECF No. 31-1, at 87:4–13.)  Burnette assumed that SPD was in a position of concealment at

11   the gas station, waiting for the suspect to leave the AM/PM store.  (Burnette Dep., ECF No. 31-1,

12   at 103: 2–5.)  Martin stated that Sacramento Sheriff Deputy Arbuckle alerted them that SPD was

13   watching a stolen vehicle at the location.  (Martin Dep., ECF No. 31-2, at 46:2–11)  Martin stated

14   that the communications they received was SPD was in the process of recovering a stolen car,

15   they had three patrol units at the AM/PM where the stolen car was located, and they had the

16   situation handled.  (Martin Dep., ECF No. 31-2, at 54:6–22.)  Burnette did not have any

17   information that anyone had fled the scene or had been taken into custody.  (Burnette Dep., ECF

18   No. 31-1, at 103:16–25.)  For some inexplicable reason, without telling his partner, Martin, and

19   without alerting dispatch, Burnette unilaterally decided to look for suspects involved with the

20   stolen vehicle.  In fact, Martin felt that after leaving the AM/PM they were simply going to

21   continue with their normal patrol.  (Martin Dep., ECF No. 31-2, at 57:1–12.)  These

22   circumstances do not support a finding that the officers had the articulable suspicion required to

23   justify Harmon's detention.  *See Gallegos*, 308 F.3d at 990.

24        Since the only information they had was that SPD had the matter under control, the fact

25   that Defendant Burnette noticed Harmon walking away from an area close to the nearby stolen

26   vehicle is of no consequence.  In addition, there was no evidence of any other crimes so the fact

27   that Harmon was in the parking lot of a closed business was also of no consequence.  Further, the

28   fact that this was a high crime area does not turn the contact with Harmon into a lawful detention

1    since there was no evidence of criminality on the part of Harmon.  Simply put, the evidence

2    presented is consistent with the conclusion that Harmon was walking home in a darkened parking

3    lot, which is not uncommon in area with residences nearby even in a high crime area.  The

4    officers have not provided this Court with evidence to support a suspicion that Harmon was

5    engaged in illegal rather than innocent conduct; all the officers had was an "inarticulate hunch."

6    *Terry*, 392 U.S. at 22.  As such, the Court finds that summary judgment as to Plaintiffs' First and

7    Second Causes of Action is denied.

8                          ii.      *Unlawful Arrest*

9         "There is 'no bright line rule for determining when an investigatory stop crosses the line

10   and becomes an arrest.'"  *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988) (quoting

11   *United States v. Hatfield*, 815 F.2d 1068, 1070 (6th Cir. 1987)).  "Rather, whether a police

12   detention is an arrest or an investigatory stop is a fact-specific inquiry, *Washington v. Lambert*, 98

13   F.3d 1181, 1185 (9th Cir. 1996), guided by the general Fourth Amendment requirement of

14   reasonableness, *Texas v. Brown*, 460 U.S. 730, 739, 103 S. Ct. 1535, 75 L.Ed.2d 502 (1983)."

15   *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002).  The Supreme Court has held

16   that a person is seized "only when, by means of physical force or a show of authority, his freedom

17   of movement is restrained."  *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980).  A

18   person has been "seized" within the meaning of the Fourth Amendment if a reasonable person

19   would have believed that he was not free to leave, in view of all of the circumstances surrounding

20   the incident.  *Id.*

21        Plaintiffs assert that the detention escalated to an unlawful arrest after Harmon ran away.

22   (ECF No. 32 at 10.)  It is Plaintiffs' position that since the detention was a violation of Harmon's

23   constitutional rights (for lack of a reasonable suspicion of criminal activity either before the

24   contact or after the contact was made) Burnette's attempted arrest was also unlawful since the

25   officers lacked probable cause to arrest Harmon.  (ECF No. 32 at 10.)  Essentially, Plaintiffs

26   argue that the governmental intrusion was unreasonable, and thus, the arrest following Harmon's

27   flight was illegal.

28        The Court has already found that during the initial contact the officers did not have

15

1    reasonable suspicion to detain Harmon, thus making it unreasonable for the officers to conduct an

2    investigatory stop.  However, the question is whether the events that transpired during Harmon's

3    flight coupled with the circumstances surrounding the original questioning gave rise to probable

4    cause.

5    　　　　In *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949), the U.S. Supreme Court

6    defined probable cause as "where the facts and circumstances within the officers' knowledge, and

7    of which they have reasonably trustworthy information, are sufficient in themselves to warrant a

8    belief by a man of reasonable caution that a crime is being committed."  Supreme Court cases

9    make clear that "an arresting officer's state of mind (except for the facts that he knows) is

10   irrelevant to the existence of probable cause."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004);

11   *see also Whren v. United States*, 517 U.S. 806, 812–813 (1996) (reviewing cases); *Arkansas v.*

12   *Sullivan*, 532 U.S. 769 (2001) (per curiam).  In other words, the officer's subjective reason for

13   making the arrest need not be the criminal offense to which the known facts provide probable

14   cause.  *Devenpeck*, 543 U.S. at 153.  "The fact that the officer does not have the state of mind

15   which is hypothecated by the reasons which provide the legal justification for the officer's action

16   does not invalidate the action taken as long as the circumstances, viewed objectively, justify that

17   action."  *Id.* (internal quotations omitted).

18   　　　　Here, the events that transpired after the initial questioning established reasonable

19   suspicion to detain Harmon; however, the Court is not convinced that probable cause existed.

20   The Supreme Court has held that:

21   　　　　　　　　[u]nprovoked flight is simply not a mere refusal to cooperate.
22   　　　　　　　　Flight, by its very nature, is not 'going about one's business'; in
     　　　　　　　　fact, it is just the opposite.  Allowing officers confronted with such
23   　　　　　　　　flight to stop the fugitive and investigate further is quite consistent
     　　　　　　　　with the individual's right to go about his business or to stay put
24   　　　　　　　　and remain silent in the face of police questioning.

25   *Illinois v. Wardlow*, 528 U.S. at 125.  Generally, where an individual is initially under no

26   obligation to cooperate with law enforcement, an individual's subsequent flight may be taken into

27   account in determining whether reasonable suspicion exits.  *See id.* at 124 ("flight—wherever it

28   occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is

certainly suggestive of such"); *Sibron v. New York*, 392 U.S. 40, 66, (1968) ("flight at the approach of strangers or law officers are strong indicia of mens rea").  In addition to fleeing the scene, Harmon was seen throwing items out of his pockets as he ran away.  It is hard for this Court to envision a situation where running away from officers while throwing items out of one's pockets might indicate to an objective observer innocuous or even ambiguous activity.  This behavior is consistent with trying to free one's self of incriminating evidence, whether it is a weapon or illegal drugs.  When Harmon ran to avoid the search for weapons, he created a reasonable suspicion, which justified the officers in stopping him in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information concerning the items he allegedly threw away.

Although the Court finds Harmon's flight created a reasonable suspicion, the Court does not find that Defendants have shown probable cause to arrest Harmon.  Specifically, the Court is troubled by a contradiction in the record concerning whether Harmon was actually discarding things from his pockets at the time of his flight.  The briefing is curiously silent as to whether narcotics or any other contraband was found discarded in the area of Harmon's flight.  In fact, Burnette stated in his deposition that no narcotics were recovered from the path of the foot pursuit.  (Burnette Dep., ECF No. 35-1 at 174:22–175:1.)  Thus, the matter of whether there was probable cause rests on the credibility of Burnette's statements about the chase, which is an inappropriate determination at the summary judgment stage.  *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) ("Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations.").  As such, the Court denies Defendants' summary judgment motion as to this claim.

C.     Plaintiffs' Seventh, Tenth, and Fourteenth Causes of Action

Defendants assert that Plaintiffs' Seventh, Tenth and Fourteenth Causes of Action against Martin should be dismissed.  (ECF No. 25-1 at 7–8.)  The Court addresses each cause of action separately below.

i.     *Count VII: Civil Rights to Familial Relations*

Plaintiffs' Seventh Claim asserts that:

17

1
2
3
4
5
6

> Defendants, acting under color of state law, and without due process of law, deprived Plaintiffs of their right to a familial relationship by seizing decedent by use of unreasonable, unjustified and deadly force and violence, causing injuries which resulted in decedent's death, all without provocation and did attempt to conceal their excessive use of force and hide the true cause of decedent's demise to deprive Plaintiff of her right to seek redress, all in violation of rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution.

7   (FAC, ECF No. 14 at ¶ 43.)  Defendants assert first that Plaintiffs' claim is not cognizable under

8   the Fourth Amendment but only the Fourteenth Amendment because Fourth Amendment rights

9   are personal to Harmon and may not be vicariously asserted.  (ECF No. 25-1 at 7.)  Although

10  Defendants are correct that normally constitutional rights cannot be vicariously asserted, "the

11  survivors of an individual killed as a result of an officer's excessive use of force may assert a

12  Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a

13  survival action."  *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998),

14  *as amended* (Nov. 24, 1998) (citing 42 U.S.C. § 1988(a); *Smith v. City of Fontana*, 818 F.2d

15  1411, 1416–17 (9th Cir. 1987)).

16      Defendants also assert, that under the Fourteenth Amendment, Martin is not vicariously

17  liable because "the right to familial relationship is predicated on the shooting death of Harmon,

18  and since Deputy Martin did not shoot Harmon, he did not interfere with the familial relationship

19  and should be dismissed from the seventh claim."  (ECF No. 25-1 at 7.)  In response, Plaintiffs

20  argue that Defendant Martin played a substantial role in the violation of Harmon's constitutional

21  rights.  Specifically, Plaintiffs contend as follows: Martin along, with Burnette, unlawfully

22  detained Harmon without reasonable suspicion; Martin questioned Harmon and attempted to

23  unlawfully search Harmon; and pursued Harmon when he ran.  (ECF No. 32 at 11.)  Finally,

24  Plaintiffs assert that Martin was aware Burnette deployed his taser and said nothing nor tried to

25  prevent the continuing escalation of force that ultimately led to Harmon's death.  (ECF No. 32 at

26  11.)

27      As to Plaintiffs' assertions concerning the legality of the stop and questioning, the Court

28  finds these arguments to be irrelevant.  It is clear that it was not the question of Harmon's

18

1    detention that caused Plaintiffs' loss of familial relations, but Burnette's decision to deploy his

2    firearm.  Thus, the crux of the matter here is Harmon's death, not the detention prior to the

3    shooting which resulted in his death.  As to Plaintiffs' claims that Martin should have prevented

4    Burnette from using the taser or discharging his firearm, this Court is not convinced that Martin

5    had the ability or opportunity to do so.

6         "[O]fficers can be held liable for failing to intercede only if they had an opportunity to

7    intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *see also See Bruner v.*

8    *Dunaway*, 684 F.2d 422, 426–27 (6th Cir. 1982) (holding that officers who were not present at

9    the time of the alleged assault could not be held liable in a section 1983 action); *Gaudreault v.*

10   *Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) (granting arresting officers' motion

11   for summary judgment because the officers had no "realistic opportunity" to prevent an attack

12   committed by another officer); *Shepherd v. Crawford*, No. 1:08-CV-00128 OWW DLB, 2010

13   U.S. Dist. LEXIS 3634 (E.D. Cal. Jan. 6, 2010) (finding no opportunity to intercede by officers

14   that had their backs turned and did not observe the use of force).  It is undisputed that Martin did

15   not use any force against Harmon during the chase and thereafter.  (Undisputed Material Facts

16   ("UMF"), ECF No. 33 pp. 150–151, 155–157.)  Furthermore, Martin was not with Burnette

17   during Burnette's on-foot pursuit because Martin was pursuing Harmon in a vehicle.  (UMF 157.)

18   There is neither evidence to support that Martin knew of any intention on behalf of Burnette to

19   use the taser or his firearm, nor any evidence that would support the notion that Martin could

20   have intervened.  The incident was short, approximately 20–30 seconds, and escalated quickly.

21   Plaintiffs have failed to present any evidence that supports their assertion that Martin was in a

22   position to prevent Harmon's death.  Accordingly, Defendants' motion to dismiss Claim Seven

23   against Martin is granted.

24              ii.      *Count X: Wrongful Death*

25        Plaintiffs' Tenth Cause of Action alleges a wrongful death claim against Burnette and

26   Martin pursuant to California Code of Civil Procedure §§ 377.60 and 377.61.  (FAC, ECF No. 14

27   at ¶¶ 55–59.)  Defendants assert that Martin is immune from liability because California

28   Government Code §820.8 provides that "a public employee is not liable for an injury caused by

19

1   the act or omission of another person." (ECF No. 32 at 7.)  Plaintiffs do not address Defendants'

2   argument in their opposition.

3        California Code of Civil Procedure § 377.60 allows a decedent's surviving spouse,

4   domestic partner, children, and issue of deceased children to bring "a cause of action for the death

5   of a person caused by the wrongful act or neglect of another."  Plaintiffs have not presented this

6   Court with any evidence or case law to support that Martin, who was not the cause of Harmon's

7   death, can be held liable under this statute.  In contrast, Defendants have provided this Court with

8   California Government Code § 820.8, which in its entirety states: "Except as otherwise provided

9   by statute, a public employee is not liable for an injury caused by the act or omission of another

10  person.  Nothing in this section exonerates a public employee from liability for injury proximately

11  caused by his own negligent or wrongful act or omission."  Cal. Gov't Code § 820.8 (West).

12  Case law supports Defendants' contention that Martin is immune under this statute.  *See Fetter v.*

13  *Bonner*, No. 2:12-CV-2235-GEB-EFB, 2015 WL 164268, at *6 (E.D. Cal. Jan. 13, 2015) (finding

14  that a sheriff that was not personally involved with creating plaintiff's alleged injuries was

15  immune pursuant to California Government Code § 820.8); *Mendez v. Montour*, No. 12-CV-

16  04170-WHO, 2014 WL 1218665, at *4 (N.D. Cal. Mar. 21, 2014) (finding that an officer was not

17  responsible for his fellow officer's actions under California Government Code § 820.8).  Thus,

18  the Court hereby grants Defendants' motion for summary judgment as to Martin on Plaintiffs'

19  Tenth Cause of Action.

20             *iii.*      *Counts IV and  XIV: Excessive Force & Assault and Battery*

21        Plaintiffs' Fourteenth Cause of Action asserts assault and battery against Martin and

22  Burnette.  (FAC, ECF No. 14 at ¶¶ 60–70.)  Defendants assert that this claim also fails against

23  Martin because the physical actions taken against Harmon, i.e. the taser and weapon discharge,

24  were taken by Burnette alone.  (ECF No. 25-1 at 7–8.)  Again, Plaintiffs do not address

25  Defendants' argument and instead rely on general statements that Martin was "integral" in the

26  outcome because he did not prevent the "escalation of force that ultimately led to Harmon's

27  death." (ECF No. 32 at 11.)  The Court also notes that Defendants argue that this claim cannot go

28  forward because "Deputy Martin is entitled to summary judgment on Plaintiffs' Fourth

1   Amendment claim for excessive force." (ECF No. 25-1 at 8.) However, Defendants did not

2   argue Martin or Burnette's liability as to Plaintiffs' Fourth Cause of Action for excessive force

3   within its Fourth Amendment briefing. Instead, the briefing pertained to illegal detention and

4   probable cause for an arrest. Thus, as it relates to both Burnette and Martin, the Court did not

5   make any findings as to Plaintiffs' excessive force claim when discussing Plaintiffs' Fourth

6   Amendment claims.[8] However, because Defendants raise concerns relating to Plaintiffs' Fourth

7   Cause of Action as it pertains to Martin within their briefing on Plaintiffs' Fourteenth Cause of

8   Action, the Court finds it appropriate to decide this matter here. Furthermore, because the same

9   conduct is the foundation of both of Plaintiffs' claims, the Court addresses them together.

10      "A prima facie case for battery is not established under California law unless the plaintiff

11   proves that an officer used unreasonable force against him to make a lawful arrest or detention."

12   *Saman v. Robbins*, 173 F.3d 1150, 1157, n.6 (9th Cir. 1999) (citing *Edson v. City of Anaheim*, 63

13   Cal. App. 4th 1269, 1273, (1998)). "[P]olice officers have a duty to intercede when their fellow

14   officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229

15   F.3d 1271, 1289 (9th Cir. 2000). "[T]he constitutional right violated by the passive defendant is

16   analytically the same as the right violated by the person who strikes the blows." *United States v.*

17   *Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996); *see*

18   *also Kyles v. Baker*, 72 F. Supp. 3d 1021, 1040 (N.D. Cal. 2014) (quoting *Koon*). Therefore, if an

19   officer is present at the scene and fails to take reasonable steps to protect the victim from another

20   officer's use of excessive force, he or she can be held liable under § 1983 for his failure to act.

21   *See Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 n.3 (1st Cir. 1990); *Kyles*, 72

22   F. Supp. 3d at 1040. "Importantly, however, officers can be held liable for failing to intercede

23   only if they had an opportunity to intercede." *Cunningham*, 229 F.3d at 1289. "A police officer

24   cannot be held liable for failing to intercede if he has no realistic opportunity to prevent an

25   attack." *Gaudreault*, 923 F.2d at 207.

26      The claim for excessive force and assault and battery arises out of the tasing and shooting

27   of Harmon, actions that undisputedly were taken by Burnette alone. (UMF 150–51, 155–56.)

28   
---
[8]   *See supra* Section III(A).

21

1   Thus, although Martin was not the actor, if Martin had the ability to intercede he could be liable

2   for failure to intervene. *See Gaudreault*, 923 F.2d at 207.  The facts alleged by the parties do not

3   support a finding that Martin had such an opportunity.

4        As mentioned in the factual background, as well as the Court's analysis of Plaintiffs' other

5   claims, the situation surrounding Harmon's death escalated very quickly.  Prior to stopping and

6   questioning Harmon, Burnette and Martin did not discuss any tactics or force that they were

7   planning to use regarding Harmon.  (Burnette Decl. at ¶ 23; Martin Decl. at ¶ 21.)   It is

8   undisputed that the conversation between Burnette, Martin, and Harmon lasted approximately 20–

9   30 seconds.  (UMF 145.)  When Harmon ran, Martin did not draw his weapon.  (UMF 142–43.)

10  Martin was not with Burnette during Burnette's on-foot pursuit because Martin was pursuing

11  Harmon in a vehicle.  (UMF, ECF No. 33 at 157.)  Martin was still in the patrol car when

12  Burnette shot Harmon.  (UMF 157; Martin Decl. at ¶ 29 ("I then drove the patrol vehicle

13  northbound through the parking lot.  As I exited the parking lot onto Lawrence I heard gunshots.

14  I turned left onto Lawrence Dr. and saw Mr. Harmon lying on the ground of the southern curb

15  line of Lawrence.").)  Again, Plaintiffs have not presented any evidence that could support that

16  Martin had an opportunity to intervene, let alone that Martin would have had a reason to believe

17  that an intervention was necessary.  The incident was short and escalated quickly from a stop to a

18  pursuit.  Because Plaintiffs cannot support their allegation that Martin had the opportunity to

19  intervene, the Court finds that summary judgment as to both Plaintiffs' Fourth and Fourteenth

20  Causes of Action is proper as to Martin.

21        D.    Duplicative Causes of Action

22        Defendants next assert that Plaintiffs' Second, Third and Fourth Claims for Relief are

23  duplicative of the First Claim and should be dismissed and that Plaintiffs' Ninth Cause of Action

24  is duplicative of the Plaintiffs' Fourth Amendment Claims and should be dismissed.  (ECF No.

25  25-1 at 8.)  The Court has already denied summary judgment as to Plaintiffs' First, Second, and

26  Third Causes of Action, finding that Defendants have not shown that they did not violate

27  Harmon's Fourth Amendment rights.  Additionally, the Court found that Plaintiffs' Fourth Cause

28  of Action for excessive force against Burnette survived, but granted summary judgement as to

22

1    Martin.[9]  Thus, the Court must now decide whether these claims are duplicative of Plaintiffs'

2    Ninth Cause of Action.

3            Plaintiffs' Ninth Cause of Action is brought against Burnette and Martin as a "survival

4    action" for "violation of Decedent's civil rights."  (FAC, ECF No. 14 at ¶¶ 51–54.)  For § 1983

5    actions brought in California, a decedent's personal representative or successor in interest may

6    assert a claim for violation of the decedent's constitutional rights.  Cal. Civ. Proc. Code §§377.20

7    & 377.30; *Hayes v. County of San Diego*, 736 F.3d 1223, 1228–29 (9th Cir. 2013) (citing

8    *Moreland v. Las Vegas Metro. Police Dep 't*, 159 F.3d 365, 369 (9th Cir. 1998)).  Defendants

9    assert that this claim is duplicative of Plaintiffs' Fourth Amendment claims.  This Court agrees.[10]

10           A district court has discretion to dismiss duplicative causes of action within a complaint.

11   *See M .M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1091 (9th Cir. 2012); *Washington v. Vericrest*

12   *Fin., Inc.*, No. 13-CV-02312-GPC-NLS, 2014 WL 635472, at *3 (S.D. Cal. Feb. 18, 2014).  Here,

13   Plaintiffs' First, Second, Third, Fourth and Ninth Causes of Action all assert that Harmon's

14   Fourth Amendment Rights were violated.  The First through Fourth Causes of Action each assert

15   a different legal theory, i.e. unlawful detention, unlawful seizure, unlawful arrest, and excessive

16   force.  The Ninth Cause of Action asserts all four of the previous legal theories of liability.

17   Accordingly, the Ninth Cause of Action asserts the same violations contained within Plaintiffs'

18   first four causes of action.  Thus, these claims require the same proof and offer identical relief.

19   Plaintiffs have not addressed within their opposition why their Ninth Cause of Action is not

20   duplicative of the First, Second, Third and Fourth Causes of Action, and this Court is unaware of

21   any legal reason to maintain two causes of action with identical proof requirements and identical

22   relief available.  Therefore, Defendants' motion for summary judgment as to Plaintiffs' Ninth

23   Cause of Action is granted.

24   ///

25   _____

     [9]      The Court granted summary judgment on Plaintiffs' Fourth Cause of Action as to Martin (*see supra* Section
26   III(B)(iii)), but the cause of action survives against Burnette.  In fact, in Defendants' reply they clarify that "Deputy
     Burnette is not moving for judgment for his use of force during the pursuit – either for his use of a Taser or for his
27   use of deadly force."  (ECF No. 36 at 1.)
     [10]     To the extent that Defendant argues that all the Fourth Amendment claims are duplicative of each other, the
28   Court finds that this argument is not availing because the proof for an unlawful detention compared with an unlawful
     arrest claim require different proof.

1

    E.       Plaintiffs' Fifth Cause of Action for Conspiracy

2

       To bring a successful claim under § 1985(3), Plaintiffs must show a conspiracy to deprive

3

Harmon of the equal protection of laws and that Defendants were motivated by "some racial, or

4

perhaps otherwise class based, invidiously discriminatory animus behind the conspirator's

5

action." *Sever v. Alaska Pulp Corp.*, 978 F. 2d 1529, 1536 (9th Cir. 1992); *Gillespie v. Civiletti*,

6

629 F.2d 637, 641 (9th Cir. 1980).  Defendants assert that Plaintiffs have failed to show racial

7

animus.  (ECF No. 25-1 at 8–9.)  In opposition, Plaintiffs contend that Martin and Burnette

8

conspired together because they "both knew they lacked reasonable suspicion to believe Harmon

9

was engaged in criminal activity."  (ECF No. 32 at 12.)  However, Plaintiffs have not presented

10

any evidence that Martin and Burnette conspired or that such conspiracy was based on race, class,

11

or any other invidiously discriminatory animus.  Quite frankly, Plaintiffs have failed to

12

demonstrate a genuine dispute of fact as to whether Defendants were motivated by racial animus

13

when Harmon was shot.  The only fact that Plaintiffs have offered to support this claim is that

14

Harmon was an African American male and that he was shot.  *See United Bhd. of Carpenters &*

15

*Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 835 (1983) ("there must be some

16

racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

17

conspirators' action").  As such, Defendants' motion for summary judgment as to Plaintiffs' Fifth

18

Cause of Action is granted.

19

    F.       Plaintiffs' Sixth Cause of Action for Wrongful Death under 42 U.S.C. § 1983

20

       Defendants assert that Plaintiffs' Sixth Cause of Action fails because wrongful death

21

claims are not compensable under § 1983: "Plaintiffs intertwine two distinct causes of action: a

22

Fourth Amendment claim on behalf of Harmon and a wrongful death claim on Plaintiffs' own

23

behalf."  (ECF No. 25-1 at 9.)  Plaintiffs have failed to address Defendants' assertion in their

24

opposition.

25

       Plaintiffs' Sixth Cause of Action alleges:

26

         Defendants acted under color of law by shooting and killing
         decedent without lawful justification and subjecting decedent to

27

         excessive force thereby depriving Plaintiff and the decedent of
         certain constitutionally protected rights, including, but not limited

28

         to:

1

2

a. The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

3

4

b. The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fourteenth Amendments to the United States Constitution;

5

6

c. The right to be free from the use of excessive force by police officers, which is guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

7

(ECF No. 14, at ¶ 41.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"In § 1983 actions, ... the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  Defendants correctly point out that "under California law, survival actions under § 1983 are distinguishable from wrongful death actions."  (ECF No. 25-1 at 9 (citing *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1228–29 (9th Cir. 2013).)  However, the case law cited by Defendants does not, as inferred by Defendants, specifically prevent a plaintiff from bringing a wrongful death claim.   Instead, the case law distinguishes the two causes of action: "In a survival action, a decedent's estate may recover damages on behalf of the decedent for injuries that the decedent has sustained.  In a wrongful death action, by comparison, the decedent's dependents may only pursue claims for personal injuries they have suffered as a result of a wrongful death." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir. 1994); *see also Schwarder v. United States*, 974 F.2d 1118, 1123 n. 3 (9th Cir. 1992)  ("[T]he cause of action granted by [California] Section 377 to the heirs and personal representatives of a decedent is not derivative in character or a continuation or revival of a cause of action existing in the decedent before his death, but is an original and distinct cause of action granted to the heirs and personal representatives of the decedent to recover damages sustained by them by reason of the wrongful death of the decedent.").  None of the case law cited by Defendants forecloses this cause of action.  In fact, this area of law has not been resolved by the Supreme Court.  *See* Section 1983 Litigation Second Edition, 2008 WL 6983697, at 175 ("The Supreme Court has not resolved whether a wrongful death claim may be brought under § 1983.  There is considerable

1    disagreement on this issue in the lower courts.  For example, some courts have viewed the

2    absence of a federal § 1983 wrongful death policy as a deficiency in federal law and, under 42

3    U.S.C. § 1988(a), have borrowed state wrongful death law").  Although, this Court has not found

4    a Ninth Circuit case on point, there are district court decisions within the Ninth Circuit following

5    the Fifth and Seventh Circuit's approach of borrowing state wrongful death law pursuant to 42

6    U.S.C. §1988(a).  *See Rentz v. Spokane Cty*., 438 F. Supp. 2d 1252, 1259 (E.D. Wash. 2006);

7    *Williams v. City of Oakland*, 915 F. Supp. 1074, 1076 (N.D. Cal. 1996); *Galindo v. Brownell*, 255

8    F. Supp. 930, 931 (S.D. Cal. 1966) ("California statutes provide both for survival of actions by a

9    decedent's executor or administrator, § 573 Cal. Probate Code, and for wrongful death actions by

10   a decedent's heirs or personal representative, § 377 Cal. Code of Civil Procedure.").  Therefore,

11   Defendants have not met their burden of showing that Plaintiffs are foreclosed from bringing a

12   wrongful death claim.

13          Although Plaintiffs are not foreclosed from bringing this claim, the Court finds that this

14   cause of action cannot survive against Martin.  This claim borrows the California state statute's (§

15   377 Cal. Code of Civil Procedure) standard for liability.  This Court has already determined that

16   Martin cannot be held liable under this standard pursuant to California Government Code §820.8.

17   *See supra* Section III(C)(ii)).  Therefore, Defendant's motion for summary judgment as to Martin

18   on Plaintiffs' Sixth Cause of Action is granted, and Defendants' motion for summary judgment

19   on Plaintiffs' Sixth Cause of Action as to Burnette is denied.

20          G.      Plaintiffs' Eleventh Cause of Action under California Civil Code § 52.1

21          Defendants next move for summary judgment on Plaintiffs' Eleventh Cause of Action

22   under California Civil Code §52.1 because Plaintiffs have not alleged threats, intimidation, or

23   coercion to support this claim.  (ECF No. 25-1 at 9.)  Plaintiffs assert that this claim is supported

24   because "[u]se of law enforcement authority to effectuate a seizure and a search can constitute

25   interference by threats, interference, or coercion if the police officer lacked a justification to seize

26   and search a person."  (ECF No. 32 at 13.)

27          Section 52.1, also known as the Bane Act, allows a person to bring a claim where a person

28   "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or

coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1 (West).  "The Legislature enacted Civil Code section 52.1 to stem a tide of hate crimes." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338 (1998); *see also Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 882 (2007) (quoting *Jones*.)  Civil Code section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion."  *Jones*, 17 Cal. 4th at 334.

For a plaintiff to obtain relief under §52.1, he "need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion." *Austin B.*, 149 Cal. App. 4th at 882 (citing *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 841–43 (2004)).  The word "interferes" as used in the Bane Act means "violates."  *See Jones*, 17 Cal. 4th at 338 (California Supreme Court equates "interfere" with "violate"); *City of Simi Valley v. Superior Court*, 111 Cal. App. 4th 1077, 1085 (2003) (holding the same).

> The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion"), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law.

*Austin B.*, 149 Cal. App. 4th at 883.  The Bane Act does not provide derivative liability for anyone not present and witnessing the actionable conduct.  Therefore, an action for wrongful death cannot be brought under this provision of the Act.  *See Bay Area Rapid Transit Dist. v. Superior Court*, 38 Cal. App. 4th 141, 144 (1995); 12 Cal. Jur. 3d Civil Rights § 106.  However, recent decisions have found that unlike wrongful death claims, a survival action can be brought on behalf of a decedent under §52.1.  *Estate of Crawley v. Kings Cty.*, No. 1:13-CV-02042-LJO, 2014 WL 2174848, at *11 (E.D. Cal. May 23, 2014) *report and recommendation adopted*, No. 1:13-CV-02042-LJO, 2014 WL 2801046 (E.D. Cal. June 19, 2014); *Medrano v. Kern Cty. Sheriff's Officer*, 921 F. Supp. 2d 1009, 1016 (E.D. Cal. 2013); *Dela Torre v. City of Salinas*, No. C-09-00626 RMW, 2010 WL 3743762, at *6 (N.D. Cal. Sept. 17, 2010).  In differentiating between the two actions, an Eastern District of California court has stated:

> [A]s pleaded, Plaintiffs' Bane Act claim is in the nature of a survival cause of action, rather than a wrongful death cause of action. Unlike wrongful death, a survival claim is not a new cause of action that vests in heirs on the death of the decedent, but rather is a separate and distinct cause of action which belonged to the decedent before death but, by statute, survives that event; the survival statutes do not create a cause of action, but merely prevent abatement of a cause of the injured person and provide for its enforcement by or against the personal representative of the deceased.

*Medrano v. Kern Cty. Sheriff's Officer*, 921 F. Supp. 2d at 1016.

Plaintiffs have alleged that their §52.1 claim is based on violations of Harmon's fourth amendment rights, specifically unlawful seizure, arrest and excessive force.  Thus, Plaintiffs' cause of action is a survival claim and is not barred under a derivative liability theory.  As such, the Court looks to the applicable case law to determine whether Plaintiffs have alleged sufficient facts to sustain a §52.1 claim based on their excessive force claim.

The elements of a claim under the Bane Act are as follows:

> 1) the defendant interfered with or attempted to interfere with the plaintiff's constitutional or statutory right by threatening or committing violent acts, 2) that the plaintiff reasonably believed that if he exercised his constitutional right the defendant would commit violence against him or his property or that the defendant injured plaintiff or his property to prevent him from exercising his constitutional right or to retaliate against the plaintiff for having exercised his constitutional right, 3) that the plaintiff was harmed, and 4) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.

*Estate of Crawley*, 2014 WL 2174848, at *13 (citing *Austin B.*, 149 Cal. App. 4th at 882).  Here, the element at issue is the first, whether Defendants interfered with Harmon's constitutional rights.  Defendants assert that Plaintiffs have not alleged an act of coercion.  This Court disagrees. Burnette's act of shooting Harmon and using excessive force could be construed as an act of intimidation or coercion to dissuade Harmon from exercising his right to refuse consent to search him.  *See id.* at *14 ("[T]he act of shooting Stephen and using excessive force against Stephen could similarly be construed as an act of intimidation and coercion to dissuade Stephen from exercising his right to refuse consent to a search in the future."); *Dillman v. Tuolumne Cty.*, No. 1:13-CV-00404 LJO, 2013 WL 1907379, at *21 (E.D. Cal. May 7, 2013) ("Where Fourth

28

1    Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is

2    at issue, there is no need for a plaintiff to allege a showing of coercion independent from the

3    coercion inherent in the seizure or use of force."); *M.H. v. Cnty. of Alameda*, No. 11–cv–02868

4    JST, 2013 WL 1701591 (N.D. Cal. Apr. 18, 2013) (standing for the proposition that where Fourth

5    Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is

6    at issue, there is no need for a plaintiff to allege a showing of coercion independent from the

7    coercion inherent in the seizure or use of force).  Thus, the Court finds that Plaintiffs' allegations

8    are sufficient to support this claim.  Therefore, Defendants' motion for summary judgment as to

9    Plaintiffs' Eleventh Cause of Action is denied.

10        H.    Plaintiffs' Twelfth Cause of Action under California Civil Code § 51.7

11       Defendants move for summary judgment on Plaintiffs' Twelfth Cause of Action asserting

12    that Plaintiffs cannot show the requisite degree of animus required under California Civil Code §

13    51.7.  (ECF No. 25-1 at 10.)  At the outset, the Court notes that Plaintiffs' opposition is devoid of

14    any argument on the subject.

15       Cal. Civ. Code § 51.7, also known as the Ralph Act, states

16            All persons within the jurisdiction of this state have the right to be
             free from any violence, or intimidation by threat of violence,
17            committed against their persons or property because of political
             affiliation, or on account of any characteristic listed or defined in
18            subdivision (b) or (e) of Section 51 [including race], or position in a
             labor dispute, or because another person perceives them to have one
19            or more of those characteristics.

20    Cal. Civ. Code § 51.7(a) (West).  "In order to establish a section 51.7 claim, a plaintiff must show

21    '(1) the defendant threatened or committed violent acts against the plaintiff; (2) the defendant was

22    motivated by his perception of plaintiff's race; (3) the plaintiff was harmed; and (4) the

23    defendant's conduct was a substantial factor in causing the plaintiff's harm.'"  *Warren v. Marcus*,

24    78 F. Supp. 3d 1228, 1248 (N.D. Cal. 2015) (quoting *Knapps v. City of Oakland*, 647 F. Supp. 2d

25    1129, 1167 (N.D. Cal. 2009)).  Defendants move for summary judgment on the grounds that there

26    is no evidence that Burnette's actions were motivated by Harmon's race.  (ECF No. 25-1 at 10.)

27    This Court agrees.  Plaintiffs have failed to demonstrate a genuine dispute of fact as to whether

28    Defendants were motivated by racial animus when Harmon was shot.  The only fact that Plaintiffs

1    have offered to support this claim is that Harmon was an African American male and that he was

2    shot.  This clearly is not enough to support animus.  *See Warren v. Marcus*, 78 F. Supp. 3d 1228,

3    1248 (N.D. Cal. 2015) (dismissing § 51.7 claim where the plaintiff testified that after he was shot,

4    he heard someone use a racial epithet, but the plaintiff did not dispute the defendant's statement

5    that he did not approach plaintiff following the shooting or use a racial epithet).  Accordingly, the

6    Court grants summary judgment as to Plaintiffs' § 51.7 claim.

7         I.    Plaintiffs' Thirteenth Cause of Action for Intentional Infliction of Emotional

8               Distress

9         Plaintiffs' Thirteenth Cause of Action for intentional infliction of emotional distress

10   ("IIED") is brought by the Plaintiffs' estate on behalf of Harmon.  (ECF No. 14 at ¶ 68.)

11   Defendants assert that this claim should be dismissed because under California law, damages

12   recoverable by the estate of a decedent do not include damages for emotional distress.  (ECF No.

13   25-1 at 10.)  Again, the Court notes that Plaintiffs' opposition is devoid of any argument on the

14   subject.

15        This claim is subject to California law.  Under California law:

16               In an action or proceeding by a decedent's personal representative
17               or successor in interest on the decedent's cause of action, the
                 damages recoverable are limited to the loss or damage that the
18               decedent sustained or incurred before death, including any penalties
                 or punitive or exemplary damages that decedent would have been
19               entitled to recover had the decedent lived, and do not include
                 damages for pain, suffering, or disfigurement.

20   Cal. Civ. Proc. Code § 377.34 (emphasis added).   Therefore, state claims for emotional distress

21   are not recoverable upon the death of the person allegedly harmed.  *Estate of Martin v. Cal. VA*,

22   560 F.3d 1042, 1050–51 (9th Cir. 2009).  As such, Defendants motion for summary judgment as

23   to Plaintiffs' Thirteenth Cause of Action is granted.

24        J.    Plaintiffs' Eighth Cause of Action for *Monell* Liability

25        In the Amended Complaint, Plaintiffs state that Sacramento County Sheriff, Scott Jones

26   ("Jones"), is sued in both his individual and official capacity.  (*See* ECF No. 14 at 2:23–26

27   ("SHERIFF JONES, in his capacity as Sheriff, is responsible for hiring, supervising, and

28   disciplining the SCSD and is the official policy maker for SCSD.  Defendant, SHERIFF JONES,

1    is sued herein in his individual and official capacity as the SHERIFF for SCSD.").)  Jones is not

2    mentioned within the factual section of Plaintiffs' Amended Complaint, but is only named as a

3    Defendant in his official and individual capacity in the body of Plaintiffs' § 1983 *Monell* claim.

4    Defendants assert that Plaintiffs improperly brought this claim against Jones in his individual

5    capacity and that bringing this claim against Jones in his official capacity as well as against the

6    County of Sacramento is redundant.  (ECF No. 25-1 at 11.)  Plaintiffs do not address this

7    argument within their opposition.

8           Personal-capacity suits "seek to impose individual liability upon a government officer for

9    actions taken under color of state law.  Thus, on the merits, to establish personal liability in a §

10   1983 action, it is enough to show that the official, acting under color of state law, caused the

11   deprivation of a federal right."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotations

12   omitted).  Plaintiffs have not alleged any facts that link Sheriff Jones to the incident which

13   resulted in Harmon's death.  In fact, the only allegations that Plaintiffs have made concerning

14   Sheriff Jones is that he is an official policy maker in charge of "hiring, supervising, and

15   disciplining the SCSD."  (ECF No. 14 at 2:23–26.)  This is not enough to maintain this cause of

16   action against Sheriff Jones in his individual capacity.  Thus, the Court turns to whether this claim

17   is appropriately brought against Sheriff Jones in his official capacity.

18          Under the Supreme Court's decision in *Monell v. New York City Dept. of Social Servs.*,

19   436 U.S. 658, 689–91 (1977), a government entity may be held liable under 42 U.S.C. § 1983,

20   but such liability must be founded upon evidence that the government unit itself supported a

21   violation of constitutional rights and not on the basis of the respondeat superior doctrine or

22   vicarious liability.  A claim against a state or municipal official in his official capacity is treated

23   as a claim against the entity itself.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The

24   Supreme Court has stated that an official capacity claim is simply "'another way of pleading an

25   action against an entity of which an officer is an agent.'  As long as the government entity

26   receives notice and an opportunity to respond, an official-capacity suit is, in all respects other

27   than name, to be treated as a suit against the entity."  *Id.* at 165–66 (quoting *Monell*, 436 U.S. at

28   690 n.55).  Therefore, when a § 1983 complaint asserts a claim against a municipal entity and

1   municipal official in his official capacity, federal district courts routinely dismiss the official

2   capacity claim as duplicative or redundant.  *See, e.g.*, *Cotton v. District of Columbia*, 421 F. Supp.

3   2d 83, 86 (D.D.C. 2006); *Baines v. Masiello*, 288 F . Supp. 2d 376, 384 (W.D.N.Y. 2003);

4   *McCachren v. Blacklick Valley Sch. Dist*., 217 F. Supp. 2d 594, 599 (W.D. Pa. 2002).  Plaintiffs

5   have not provided this Court with any reason that these claims are not redundant, thus the Court

6   finds it appropriate to dismiss the claims against Sheriff Jones.

7        Defendants also assert that Plaintiffs' claims against the County of Sacramento fail

8   because Plaintiffs have failed to allege an express policy that led to the alleged violations of

9   Harmon's rights.  In opposition, Plaintiffs clarify that it is not per se the County's policy that led

10   to Harmon's death but rather its failure to adequately train officers on excessive force.  (ECF No.

11   32 at 6.)

12        Municipal liability only attaches when execution of a government's policy or custom

13   inflicts the plaintiff's injury.  *Monell*, 436 U.S. at 694; *see also Bd. of Cnty. Comm'rs of Bryan*

14   *Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).  A plaintiff may demonstrate a policy or custom

15   of a municipality by showing one of the following:

16          (1) a longstanding practice or custom which constitutes the standard
            operating procedure of the local government entity;
17

18          (2) that the decision-making official was, as a matter of state law, a
            final policymaking authority whose edicts or acts may fairly be said
            to represent official policy in the area of decision; or
19

20          (3) that an official with final policymaking authority either
            delegated that authority to, or ratified the decision of, a subordinate.

21   *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing *Ulrich v. City and County*

22   *of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)) (internal quotation marks and citations

23   omitted).  The Ninth Circuit has held that a single incident will not suffice to show a policy.  *See*

24   *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).  In order to succeed, Plaintiff must show a

25   longstanding practice or custom which constitutes the standard operating procedure of the local

26   government entity.  *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  "The custom must be

27   so 'persistent and widespread' that it constitutes a permanent and well settled city policy."  *Id.*

28   (quoting *Monell*, 436 U.S. at 691).  "Liability for improper custom may not be predicated on

1  isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency

2  and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

3      In *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), the Supreme Court held that

4  deliberately indifferent training may give rise to § 1983 municipal liability.  However, it limited

5  liability to instances "only where the failure to train amounts to deliberate indifference to the

6  rights of persons with whom the police come in contact," and that deliberate indifference was the

7  moving force of the violation of the plaintiff's federally protected right.  *Id.* at 388.  Therefore,

8  "only where a municipality's failure to train its employees in a relevant respect evidences a

9  'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly

10  thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.* at 389.  To succeed

11  the plaintiff must demonstrate specific training deficiencies and either (1) a pattern of

12  constitutional violations of which policy-making officials can be charged with knowledge, or (2)

13  that training is obviously necessary to avoid constitutional violations, e.g., training on the

14  constitutional limits on a police officer's use of deadly force.  *Id.* at 390–91.  Neither negligent

15  nor even grossly negligent training by itself gives rise to a § 1983 municipal liability claim.  *Id.* at

16  391–92 ("In virtually every instance where a person has had his or her constitutional rights

17  violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could

18  have done" to prevent the unfortunate incident . . .  Thus, permitting cases against cities for their

19  "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result

20  in de facto respondeat superior liability on municipalities—a result we rejected in *Monell*.").

21      The issue in this case is whether the training program is adequate; and if it is not, the

22  question becomes whether such inadequate training can justifiably be said to represent

23  Sacramento County's policy.  In support of its claim, Plaintiffs present this Court with statistics

24  that show a rise in officer-involved shootings that resulted in deaths over the past few years.

25  (ECF No. 32 at 6.)   However, these statistics do not provide any detail as to a pattern of conduct

26  involved in the eight incidents in 2012, which would enable this Court to make a determination as

27  to a specific deficiency in Sacramento County's officer training.  *See Canton*, 489 U.S. at 390

28  (requiring a plaintiff to demonstrate specific training deficiencies).  Thus, standing alone

Plaintiffs' statistics do not establish any uniformity that could support allegations of a custom or practice. Plaintiffs also submitted the report of their expert, John Ryan. (Ryan Report, ECF No. 31-5.) His report offers the following findings:

> It is noted that according to the Inspector General report, in-service training on use of force began in 2012, the same year where there was a dramatic spike in officer involved shootings and in which the shooting of Lamar Harmon occurred. (Inspector General Report/Morgan P.63/65). According to the grand jury report concerning officer involved shootings in the Sheriff's Office, the training, which occurred after the shooting in this case, was roll-call type training which did not include lessons learned from many of the 2012 shootings. (GJ). As noted by the grand jury the trainings were brief and distracted by other matters pertaining to starting the work shift. (GJ).

> A grand jury reviewing the practices of the Sheriff's Office in relation to officer-involved shootings noted that the Sheriff's Office had a process (Tactical Review Board) in place for reviewing such shootings, however it had been defunct for a number of years. (GJ). It is noted that the grand jury recommended a number of action steps for the review of officer-involved shootings in an effort to create accountability and transparency in the process. (GJ). (¶ 104.)

(Ryan Report, ECF No. 31-5 at ¶¶ 102, 104.) Again, the information provided are conclusions about the officers' training without any factual information as to how this training is deficient. Furthermore, Defendants' point—that both the Inspector General's 2012 Report and the Grand Jury 2013 report relied upon by Plaintiffs were created after Harmon's death—is well taken. The Court is not convinced that this evidence can support a custom or policy as Plaintiffs allege, but in the event that it did, officials cannot be held responsible for not reacting to data that was not available to them prior to the incident occurring. As such, the Court finds that Plaintiffs have not met their burden to establish municipality liability under *Monell*, and Defendants' motion for summary judgment as to Plaintiffs' Eighth Cause of Action is therefore granted.

### IV.   CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Defendants' Motion for Summary Judgment as to **Plaintiffs' First Cause of Action** is **DENIED**;

2. Defendants' Motion for Summary Judgment as to **Plaintiffs' Second Cause of Action**

is **DENIED**;

3.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Third Cause of Action** is **DENIED**

4.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Fourth Cause of Action as to Defendant Martin** is **GRANTED**;

5.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Fifth Cause of Action** is **GRANTED**;

6.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Sixth Cause of Action** is **GRANTED as to Defendant Martin** and **DENIED as to Defendant Burnette**;

7.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Seventh Cause of Action as to Defendant Martin** is **GRANTED**;

8.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Eighth Cause of Action** is **GRANTED**;

9.  Defendants' Motion for Summary Judgment as to **Plaintiffs' Ninth Cause of Action** is **GRANTED**;

10. Defendants' Motion for Summary Judgment as **to Plaintiffs' Tenth Cause of Action as to Defendant Martin** is **GRANTED**;

11. Defendants' Motion for Summary Judgment as to **Plaintiffs' Eleventh Cause of Action** is **DENIED**;

12. Defendants' Motion for Summary Judgment as to **Plaintiffs' Twelfth Cause of Action** is **GRANTED**;

13. Defendants' Motion for Summary Judgment as to **Plaintiffs' Thirteenth Cause of Action** is **GRANTED**; and

14. Defendants' Motion for Summary Judgment as to **Plaintiffs' Fourteenth Cause of Action as to Defendant Martin** is **GRANTED**.

///

///

///

35

1    Because all of the claims against Defendants Jones and the County of Sacramento have

2  been dismissed, the Court hereby dismisses these Defendants from this action.

3    IT IS SO ORDERED.

4  Dated: January 26, 2016

5

6

7                                          Troy L. Nunley
                                           United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28